# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-0549V

|  |  |
|---|---|
| JARED TRINNAMAN,<br><br>　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: December 11, 2023<br><br>Special Processing Unit (SPU);<br>Influenza (Flu) Vaccine; Shoulder<br>Injury Related to Vaccine<br>Administration (SIRVA); Six Month<br>Severity Requirement |

*Laura Levenberg, Muller Brazil PA, Dresher, PA, for Petitioner.*

*Julia Marter Collison, U.S. Department of Justice, Washington, DC, for respondent.*

### DECISION DISMISSING CASE[1]

On January 11, 2021, Jared Trinnaman filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza ("flu") vaccine he received on September 23, 2019. Petition at 1. This case was assigned to the Special Processing Unit of the Office of Special Masters.

Respondent argues that the claim cannot meet the Vaccine Act's "severity requirement," and for the reasons stated below, I deem the claim appropriately dismissed on that basis.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.      Procedural History

On February 3, 2023, Respondent filed his Rule 4(c) Report arguing that "Petitioner is not entitled to compensation because he has not established that he suffered from an alleged vaccine-related shoulder injury for more than six months post-vaccination." Rule 4(c) at 5. Petitioner filed a Motion for Ruling on the Record ("Mot.") on March 6, 2023. ECF No. 27. Respondent filed a response ("Opp.") on April 26, 2023, and Petitioner filed a reply ("Reply") on May 11, 2023. ECF No. 28, 31. The matter is ripe for resolution.

## II.      Factual Background

Petitioner was 36 years old when he received the flu vaccine in his right deltoid at his primary care provider's ("PCP") office on September 23, 2019. Ex. 3 at 1.

Two weeks later, on October 8, 2019, Petitioner had a telephone appointment with his PCP, at which time he reported right shoulder pain after the vaccination. Ex. 4 at 90. Petitioner stated that he had tried ice and rest, but that he did "not want to try medication for pain/inflammation," and requested an in-person exam. *Id.*

The following day, Petitioner saw his PCP as requested. Ex. 4 at 101. Petitioner reported pain since the vaccination, and an "inability to move his arm." *Id*. On exam, he had full passive range of motion without pain, but reported pain with active range of motion. *Id*. at 102. He was offered physical therapy. *Id*. During a telephone follow-up later that evening, Petitioner reported receiving the vaccination "high in the right shoulder," and that the pain was "dull aching to sharp at 8/10 if lifting." *Id*. at 107. Petitioner "insist[ed] on xray and seeing orthopedics," but declined an orthopedic appointment the follow day due to travel. *Id.* at 109. Petitioner requested an appointment the following Tuesday (October 15, 2019). *Id*. Petitioner had an x-ray the following day, October 10, 2019, which was normal. *Id*. at 131.

On October 15, 2019, Petitioner was examined by an orthopedist. Ex. 4 at 139. He reported shoulder pain and stiffness that was "slowly getting better." *Id*. He was diagnosed with adhesive capsulitis, and advised to do online physical therapy[3] and to use ibuprofen rather than a narcotic medication. *Id*. at 142. The orthopedist noted that "he is already getting better and has made tremendous gains in a short period of time," and explained that "this should resolve on its own with more time." *Id.*

---

[3] There is no evidence in the record that Petitioner ever attended any physical therapy sessions, however, or performed the recommended therapy by himself.

Petitioner returned to his PCP on October 30, 2019, with skin and toenail complaints. Ex. 4 at 166. Although there was no examination of his shoulder, Petitioner requested and received a refill of acetaminophen, with codeine for his right shoulder pain. *Id.* at 168.

Petitioner next sought medical treatment five months later, on March 10, 2020, when he visited his PCP for a right finger infection. Ex. 4 at 180. He made no mention of shoulder issues at this time. Then, on May 26, 2020, Petitioner had a telephone appointment with his orthopedist, during which he stated that he continued to have pain with lifting and overhead motion. Ex. 4 at 197. No examination was performed. *Id*. The doctor speculated that Petitioner's symptoms could be rotator cuff tendinitis or lingering pain from adhesive capsulitis, and recommended an in-person evaluation. *Id*. He did not believe an MRI was necessary. *Id*.

On September 5, 2020, Petitioner had a video appointment with his PCP for a rash, foot pain, and skin and nail issues. Ex. 4 at 213. His medical history referenced "frozen shoulder resulting from a flu shot." *Id*. No shoulder examination was performed. Petitioner wanted to avoid anti-inflammatories, including cortisone injections, for his right shoulder pain. *Id.* at 214. Blood work and x-rays were ordered to address Petitioner's joint pain. *Id*. The bloodwork showed Petitioner's rheumatoid factor to be slightly elevated. *Id*. at 241.

On October 30, 2020, Petitioner had a video appointment with his PCP with complaints of continued right shoulder pain. Ex. 4 at 250. He stated he was "doing some exercises . . . but continues with some pain," particularly with overhead movement. *Id*. The records notes that Petitioner "does appear to have full range of motion of shoulders." *Id*. at 251. The doctor recommended that he continue exercises to maintain range of motion, and possibly, a cortisone injection if there was no improvement. *Id.*

On December 16, 2020, Petitioner had a video appointment with his PCP for issues unrelated to his shoulder pain. Ex. 4 at 271. The record does not mention right shoulder symptoms. There are no further records evidencing additional treatment for Petitioner's shoulder pain.

### III.    Authority

The Vaccine Act requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Vaccine Act §11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. §13(a)(1)(A). "[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged

injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering

such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

### IV.    Analysis

Respondent contests Petitioner's ability to establish that the residual effects of his vaccine injury continued for more than six months, as required by the Vaccine Act. Opp. at 5. Because Petitioner received his vaccination on September 23, 2019, he must establish that his residual symptoms continued until at least March 23, 2020. Ex. 3 at 1.

The record clearly demonstrates that Petitioner sought treatment within 15 days of his vaccination. Ex. 4 at 90-91. He had two appointments with his PCP, one x-ray, and one appointment with an orthopedist in the next fifteen days, through October 30, 2019 (five weeks after his vaccination). *Id*. at 101, 131, 139, 167. Thereafter, there was a seven-month gap (or until May 26, 2020) before Petitioner again sought treatment for his right shoulder pain. *Id*. at 180-181. During this time, Petitioner received medical treatment only on one occasion - March 10, 2020, for an infection in his finger. *Id*. at 197. After, there was another gap of approximately three months, until September 5, 2020, before the next report of shoulder pain. *Id*. at 197.

Petitioner argues that he has satisfied the statutory severity requirement because he "sought regular treatment for his right shoulder pain through October 29, 2020, over one year after his vaccine." Mot. at 7. The medical records, however, reveal sporadic rather than "regular," treatment, with gaps of seven months, and then three months, between appointments. The gap between initial presentation (which established some SIRVA elements) and Petitioner's March 2020 treatment is especially damaging to a finding of severity.

Petitioner explained in a supplemental declaration that the gaps in treatment were due to his work, which required him to "travel all over the country," causing him to be "typically home once a week," and "unable to take any paid time off to visit the doctor." Ex. 7 at ¶4-5; Mot. at 9. He also stated that the doctor told him he "could not do much other than physical therapy or a hydrocortisone shot," which he did not want. Ex. 7 at ¶4. But a close review of the filed records does not support Petitioner's claims.

First, Petitioner's travel records indicate that he did seek care when he needed it between work travel. For example, Petitioner had an appointment with his PCP on October 30, 2019 (the day he left on travel), during which he received a refill of pain medication for his shoulder pain. *See* Ex. 4 at 167; Ex. 8 at 26. He also had a medical

appointment on March 10, 2020, between travel ending March 8, 2020, and more travel beginning on March 12, 2020. Ex. 4 at 180; Ex. 8 at 19, 30. Further, Petitioner was traveling at the time he initially sought treatment for his shoulder pain - suggesting that if his symptoms had continued, he would have continued to seek treatment despite his work schedule. *See* Ex. 4 at 131 (x-ray on a travel day), 139-140 (orthopedist the day after returning); 166 (appointment on a travel day); Ex. 8 at 8, 26. Finally, Petitioner did not travel between November 12, 2019 and January 1, 2020, a period of seven weeks very close in time to his vaccination – and he did not seek any treatment for his shoulder pain. *See* Reply at 4. This record thus establishes that Petitioner found opportunities *around* his travel to seek treatment for his shoulder pain, and could have continued to do so close in time to his vaccination had it been necessary.

Second, Petitioner visited the doctor on March 10, 2020 for a right finger infection – but did not at this time mention right shoulder pain. Ex. 4 at 180-181. Although intervening medical appointments to address issues unrelated to a possible SIRVA are often overlooked, or given less weight when evaluating whether claim elements are met, the context here is different. As noted, Petitioner had taken time between travel to make an appointment for an acute medical concern, suggesting he would likely have sought care for his shoulder complaints had they still existed. At best, however, the relevant record notes that Petitioner's "active problem list" included adhesive capsulitis, but the exam noted "no joint tenderness." *Id*. Further, the relevant treater was his PCP, who had provided care to Petitioner for shoulder pain in the past. *Id.*

In addition, Petitioner had made a point of mentioning his shoulder pain and requested a medication refill at an appointment on October 30, 2019, when he saw his PCP for other conditions, including skin and toenail problems. Ex. 4 at 166-167. Thus, if Petitioner had continued to have right shoulder pain at the time of his March 10, 2020 appointment (very close to six months after his vaccination), he more likely than not would have mentioned it to his PCP. The record overall supports the conclusion that Petitioner was not one to avoid medical treatment when he felt it necessary – thereby supporting the conclusion that he would have continued to seek treatment during the gap in treatment if he was still experiencing sequelae.

Admittedly, Petitioner sought medical care for right shoulder pain on a few occasions outside of or beyond the six-month period - specifically on May 26, 2020, September 5, 2020, and October 29, 2020. In many cases, efforts to treat shoulder pain complaints just beyond the severity timeframe allow the conclusion that the claimant was still experiencing pain, even if he or she did not consistently seek treatment in the initial six months from onset. Here, however, these instances of post-six months treatment do not provide preponderant evidence that his symptoms *at that time* were a continuation of his previous shoulder pain, and therefore, caused by his vaccination.

The appointment on May 26, 2020 with the orthopedist, for example, was by telephone with no physical examination (although Petitioner did report improved range of motion since his last visit). Ex. 4 at 197. The orthopedist recommended an in-person evaluation, proposing that "given his resolution of stiffness, this could be cuff tendinitis versus lingering pain from adhesive capsulitis." *Id*. The orthopedist's speculation suggests that he believed there could be an alternative cause for Petitioner's symptoms on that date, but that an examination was necessary to make that determination. But Petitioner did not return to his orthopedist again. *Id*.

The visits with Petitioner's PCP on September 5, 2020 (more than three months later) and October 29, 2020 (five months later) were also telemedicine appointments, with no physical examination of Petitioner's shoulder. Ex. 4 at 213, 250. At the September 5, 2020 appointment, the doctor does not appear to have made any assessment of Petitioner's shoulder, and only notes that Petitioner does not want to use anti-inflammatory medications, including injections. *Id*. at 213-14. Again, the doctor encouraged Petitioner to return if he continued to have symptoms. *Id*. at 214. And at the final telemedicine visit on October 29, 2020, Petitioner reported that his shoulder pain had been improving, but worsened again after sleeping on it. Ex. 4 at 251. The doctor speculated that there was "potentially" impingement syndrome and recommended continuing exercises and possibly a corticosteroid injection. *Id*. Petitioner did not follow up.

Petitioner has stated that, as of February 21, 2023, he "continues to do stretches, exercises and ice for [his] shoulder," and has even purchased two new mattresses to try to help with his pain. Ex. 7 at ¶6. But Petitioner's supplemental declaration does not state when he began those exercises, and the only evidence in the record to corroborate such contentions is found in records from his October 29, 2020 appointment, which occurred more than a year after vaccination. Ex. 4 at 250. There is simply insufficient evidence of continuous symptoms from vaccination through at least March 23, 2020.

Given the above, I cannot conclude that Petitioner suffered the residual effects of his vaccine-related injury for the six months required by the Act. The gaps in treatment, coupled with Petitioner's general pattern in seeking medical care between his work travel when he deemed a health problem significant enough to warrant it, undermines the conclusion that Petitioner's symptoms continued through at least March 23, 2020.

## CONCLUSION

Because Petitioner has failed to meet the statutory severity requirement set forth in Section 11(c)(1)(D)(i), Petitioner cannot establish entitlement and therefore, I must **DISMISS** his claim in its entirety. **The Clerk shall enter judgment in accord with this Decision.**[4]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[4] If Petitioner wishes to bring a civil action, he must file a notice of election rejecting the judgment pursuant to § 21(a) "not later than 90 days after the date of the court's final judgment."